IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>v.<br><br>JAMES LEE ESPINOSA,<br><br>                Defendant. | **MEMORANDUM DECISION & ORDER**<br><br><br><br>Case No. 1:17-cr-55-CW<br><br>District Judge Clark Waddoups |

Before the court is Defendant James Lee Espinosa's Motion to Suppress evidence obtained as a result of Mr. Espinosa's detention on April 29, 2017. (ECF No. 15.) The court held an evidentiary hearing on February 9, 2018 (ECF No. 19), after which the parties filed post-hearing briefs (ECF Nos. 24–26.) The court then held oral argument on the Motion on April 11, 2018. (ECF No. 27.) Having consider the evidence and arguments before it, and based on the findings of fact and conclusions of law contained herein, the court determines that the detention of Mr. Espinosa was pursuant to officer safety concerns during a lawful traffic stop. Therefore, the court DENIES Mr. Espinosa's Motion.

## BACKGROUND[1]

On the night of April 29, 2017, detectives Douglas Dunbar and Kevin Shawn Grogan of the Ogden Metro Gang Task Force,[2] (Tr. 6: 7–8; 52:18–19), were in West Ogden, Utah

---

[1] The material facts are not disputed, and to the extent details are disputed, the court "view[s] evidence in light most favorable to the government." *United States v. Morgan*, 85 F.3d 1122, 1125 (10th Cir. 2017).

[2] According to Detective Dunbar, the Ogden Metro Gang Task Force is an FBI task force with the Ogden Police Department. (Tr. 6: 7–8; 7: 6.) The officers' duties with the Task Force were "[t]o suppress and investigate all gang activity, violent crimes in the Weber County area." (Tr. 7:12–15.) Detectives Dunbar and Grogan have been in law enforcement for more than six and twenty years respectively. (Tr. 6: 2–11; 52: 22.)

patrolling an area near 2500 F Avenue (Tr. 7: 22–8: 4; 53: 3–8.) Both officers testified that around 10:00 p.m. circumstances arose that prompted them to go to an apartment complex at 2515 F Avenue. (Tr. 8: 22–9: 3; 54: 2–4.) Outside of the apartment complex, the officers observed a Nissan Altima that was parked curbside across the street from the apartment complex. (Tr. 10: 7–8; 54: 2–4, 19.) The officers were parked such that they were facing the rear of the Altima. (Tr. 11: 6–9; 54: 12–13.) The officers witnessed the Altima pull away from the curb without signaling. (Tr. 11: 2–3; 54: 12–14.) A woman, who the officers eventually learned was Renee Gallegos, was driving and there was a male passenger, Mr. Espinosa. (Tr. 54: 3–4.) The officers followed (Tr. 55: 2), and when they observed the Altima roll about a half a car's length past the white line next to the stop sign (Tr. 11: 19–6; 12: 8; 55: 9–19), they turned on their emergency red and blue lights to stop the vehicle. (Tr. 55: 23–56: 5.) The Altima pulled over, and the officers began the traffic stop at 10:45 p.m. (Tr. 41: 17–22; Exhibit H.)

When the Altima came to a complete stop, the two officers exited their vehicle and approached from both sides, with Detective Dunbar approaching the driver-side window and Detective Grogan the passenger-side, where Mr. Espinosa was seated. (Tr. 56: 18–20; 57: 6–11.) The passenger-side window was rolled down, and Detective Grogan could hear Detective Dunbar's communication with the occupants. (Tr. 57: 15–20.)

From the driver-side window, Detective Dunbar asked Ms. Gallegos for her license, registration, and proof of insurance. (Tr. 13: 25–14: 5–12.) Detective Dunbar observed that Ms. Gallegos "kept fumbling with her cell phone" and "kept trying to make phone calls." (Tr. 14:12–13.) For officer safety reasons, Detective Dunbar asked Ms. Gallegos to put down her phone, but "she just couldn't—couldn't get past what she was thinking about on her phone to get her

information." (Tr. 14: 17–19.) Ms. Gallegos explained that her actions were hurried because she needed to pick up her daughter, and she contradicted Detective Dunbar, saying that "he was kind of ignoring [her]." (Tr. 86: 18–25.) She did acknowledge, however, using her phone during the course of their initial interaction. (Tr. 87: 3–15.) Detective Grogan testified that Ms. Gallegos "said that she was in a hurry and that she had to pick up her children." (Tr. 58: 7–8.) Nevertheless she eventually put her phone down and provided her documents. (Tr. 14: 23–25.) Detective Grogan testified that "later in the stop [she] continued to make more phone calls but initially she stopped." (Tr. 58: 10–11.)

While Ms. Gallegos was using her phone and retrieving her documents, Detective Dunbar observed that the passenger "was fidgeting a lot and . . . looking around. He was very nervous as [Detective Dunbar] was speaking with the driver." (Tr. 15: 3–6.) Detective Dunbar testified that the passenger's nervousness was notable and that he asked the passenger for his name. (Tr. 15:6–8.) The passenger responded that his name was Juan Rendon. (Tr. 15: 10.) Detective Dunbar testified that he "knew [the passenger's name] was not Juan Rendon," though he "couldn't think of it offhand." (Tr. 15: 11–15, 24.) He had interacted with Espinosa on two previous occasions, one of which was "less than a year" before. (Tr. 15: 16–18, 16: 2–3.) On the most recent occasion, Detective Dunbar was present while Espinosa was arrested in another officer's case. (Tr. 16: 4–9.) Detective Dunbar communicated his knowledge of the passenger to Detective Grogan, telling Grogan that "he had arrested [the passenger] previously, had dealt with him on other occasions, believed that he was on parole, and knew that [Juan Rendon] was not his correct name." (Tr. 60: 5–10.)

At this point, Detective Dunbar continued with Ms. Gallegos. (Tr. 16: 13–15.) After she provided her information and while he was waiting for her records check to return, he asked her to exit the vehicle. (Tr. 16: 21–17:3.) Detective Dunbar testified that he asked her to exit because "she continued to get fidgety and nervous" and because of the false information the passenger provided about his identity. (Tr. 17:3–7.) He further testified that "as [he] was asking the passenger his name, he had placed a seat belt on," so Detective Dunbar instructed Ms. Gallegos to get out of the car to avoid a potential "vehicle pursuit." (Tr. 17: 7–10; 87: 16–23.)

While Ms. Gallegos was out of the car, Detective Dunbar used his "portable radio" to run Ms. Gallegos's driver's license "through . . . Weber dispatch" so that dispatch could "run her through the system to see if she ha[d] a valid driver's license, any warrants, any NCIC hits, anything like that" while he was standing near the vehicle. (Tr. 17: 15–22; 17: 25–18: 1; 40: 16–18.) He testified that he believed he ran Ms. Gallegos's name through dispatch before Juan Rendon was reported to dispatch. (Tr. 40: 22–23.) But the dispatch log showed the name Juan Rendon was in fact reported before the name Rene Gallegos. (Tr. 41:20–25; Exhibit H.) Rendon was reported at 10:53 p.m., while Gallegos was not reported until 11:08 p.m. (Tr. 41: 20–25; Exhibit H.) Detective Dunbar asserted that he called in Ms. Gallegos's information before going around to the passenger side of the vehicle. (Tr. 49: 13–19.)

Up to this point, aside from "concern of the passenger lying . . . about his name," Detective Dunbar was focused on Ms. Gallegos. (Tr. 18: 18–19: 1.) During this time Detective Dunbar asked Ms. Gallegos about the passenger's identity. (Tr. 19: 5–10; 59: 19–60:4; 88: 10–13.) She told him that Juan Rendon was not the passenger's name. (Tr. 19: 11–13.) Detective

Dunbar recalled that she told him the passenger's "name is not Juan Rendon but you'll figure it out" but that she did not tell him the passenger's real name. (Tr. 45: 12–17.)

Meanwhile Detective Grogan had remained with the passenger. (Tr. 19: 2–3.) Detective Dunbar eventually left Ms. Gallegos to assist Detective Grogan with the passenger. (Tr. 19: 14–16.) He did this because, after hearing the false name from the passenger and confirmation of its falsity from Ms. Gallegos, Detective Grogan had observed several items that caused him concern, including what he believed at the time to be a bat and some drug paraphernalia within the passenger's reach.[3] (Tr. 19: 17–24; Tr. 62: 5–22.) Detective Dunbar had also asked the passenger if he was on parole, and the passenger said he was not. (Tr. 20: 1–4.) Detective Dunbar had communicated, however, to Detective Grogan that he believed the passenger was on parole, and Grogan had told Dunbar about seeing the purported bat and paraphernalia, as well as that the back passenger window "was . . . smashed [and] looked like it was fresh damage." (Tr.60: 18–22.). Detective Grogan believed the damage was fresh because "[t]here was clothing on the backseat . . . and [the glass] was on top of the clothing." (Tr. 61: 1–4.)

Having observed these items "along with the investigation of the false information," the officers asked the passenger to exit the vehicle. (Tr. 19: 23–24; 64: 1–2.) The passenger refused, and began shifting in his seat with his seatbelt off, acting as if he might get out of the car and then reaching around behind him. (Tr. 20: 10–13; 64: 11–14.) The passenger refused to voluntarily exit the vehicle, and eventually the officers each grabbed an arm and removed him. (Tr. 20: 14–20; 64: 14–17.) Once the passenger was out of the car and secured, the officers

---

[3] Photographs taken at the scene after Mr. Espinosa was arrested reveal what appears to be a large metal flashlight lodged between the driver seat and center console, and Detective Grogan testified that in fact it was a flashlight, though they did not know that at the time. (Exhibit 4; Tr. 62: 5–14.) Detective Dunbar believed "the handle was maybe a foot above the seat." (Tr. 46: 6–7.)

observed that he had been "sitting on a full sized pistol along with two cell phones." (Tr. 20: 23–21: 3.) Sometime after the officers took the passenger into custody, they found a Utah I.D. in his wallet that identified him as James Leroy Espinosa. (Tr. 23: 1–4.) Still later, they released Ms. Gallegos without issuing her a ticket or warning. (Tr. 25: 12–21; 49: 20–25.)

**ANALYSIS**

Mr. Espinosa moves to suppress all evidence acquired as a result of the traffic stop, arguing that the officers "unlawfully detained and removed [him] from Ms. Gallegos's vehicle." (Defendant's Memorandum 6, ECF No. 24.) Specifically, he contends that the officers "abandoned the initial purpose of the traffic stop and expanded the investigation without a warrant and without reasonable suspicion." (*Id.*) The government responds that the officers' conduct was permitted because it did not extend the stop or if it did the delay was based on reasonable suspicion and resulted from Mr. Espinosa's and Ms. Gallegos's refusal to cooperate. (United States's Memorandum 5, ECF No. 55.)

The Fourth Amendment to the Constitution protects against "unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop is a seizure but is 'reasonable where the police have probable cause to believe that a traffic violation has occurred.'" *United States v. Morgan*, 855 F.3d 1122, 1123 (10th Cir. 2017) (quoting *Whren v. United States*, 517 U.S. 806, 809–10 (1996)). "[B]ecause a routine traffic stop is more analogous to an investigative detention than a custodial arrest," the court analyzes the stop under the two-part inquiry established in *Terry v. Ohio*, 392 U.S. 1 (1968) . *Morgan*, 855 F.3d at 1125. Thus, the court must determine whether the stop was "(1) justified at its inception and (2) reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Karam*, 496 F.3d 1157, 1161

(10th Cir. 2007) (quotations omitted). And "[t]he touchstone of [the court's] analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Morgan*, 855 F.3d at 1126 (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977)). "Reasonable suspicion is based on the totality of the circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense." *United States v. Rice*, 483 F.3d 1079, 1083 (10th Cir. 2007).

Mr. Espinosa does not dispute that the stop was initially justified (Defendant's Motion 9, ECF No. 24), and the court is satisfied that it was. "'[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'" *Morgan*, 85 F.3d at 1125 (alteration in original) (quoting *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995)). The officers both testified that Ms. Gallegos crossed the white stop line next to the stop sign, which is a violation of Utah Code Annotated § 41-6a-902.

Mr. Espinosa claims that the stop became unconstitutional, however, because it lasted beyond the time necessary for "a brief license and registration check and issuance of a warning or a citation, ending the stop only minutes after it began." (*Id.* at 10.) Generally, a traffic stop involves "run[ning] computer checks on the driver's license, the vehicle registration papers, and on whether the driver has any outstanding warrants or the vehicle has been reported stolen." *United States v. Mendez*, 118 F.3d 1426, 1429 (10th Cir. 1997). And "once the computer checks confirm that the driver has produced a valid license and proof of entitlement to operate the car,

the driver must be permitted to proceed on his way, without further delay by police for additional questioning." *Id.*

But because there is risk to officer safety inherent in traffic stops, "[t]he proper scope of a traffic stop" also "includes 'certain negligibly burdensome precautions' taken for officer safety." *United States v. Cone*, 868 F.3d 1150, 1151 (10th Cir. 2017) (quoting *Rodriguez v. United States*, 135 S.Ct. 1609, 1616 (2015)). Therefore, officers may ask questions, for instance, about identity, criminal history, and travel plans of any person in the stopped vehicle. *See id.* at 1153–55. The *Rodriguez* court affirmed the "need to take certain negligibly burdensome precautions in order to complete [the] mission safely" and distinguished such safety precautions from investigatory conduct such as dog sniffs, concluding that the former is permissible while the latter is impermissible even if the "imposition . . . was no more intrusive." 135 S.Ct. at 1616; *see also Penn. v. Mimms*, 434 U.S. 106, 109 (1977) (establishing the rule that an officer may order a driver to exit his or her vehicle without suspicion that the driver may commit a crime); *Md. v. Wilson*, 519 U.S. 408, 415 (1997) (extending the rule established in *Mimms* to vehicle passengers). Thus, the Tenth Circuit has concluded without qualification that, as a part of a lawful traffic stop, an officer may request a passenger's identification information, *Rice*, 483 F.3d at 1084, and "has authority to order the driver and passengers from the car." *Morgan*, 855 F.3d at 1123.

Here, as in all traffic stops, the public interest in officer safety outweighed the passenger's interests and justified Detective Dunbar's decision to ask the passenger for his identification and later to ask him to step out of the vehicle. *See Wilson*, 519 U.S. at 413–15 (concluding that because officer safety during a traffic stop outweighs a passenger's privacy

right in remaining in the stopped vehicle no Fourth Amendment violation occurred when an officer asked a passenger to exit the vehicle); *Rice*, 483 F.3d at 1084 ("Furthermore, because passengers present a risk to officer safety equal to the risk presented by the driver, an officer may ask for identification from passengers and run background checks on them as well." (citations omitted)). And while suspicion was not required, here the officers had several reasons to believe that the passenger of the vehicle posed a threat to their safety: (1) he provided a name one of the officers knew to be false in violation of Utah Code Annotated § 76-8-507, which makes it a class C misdemeanor to provide false information such as a name or birthdate to a peace officer;[4] (2) there was a large metal tool that Officer Grogan believed to be a bat within the passenger's reach; (3) there was drug paraphernalia on the floorboard of the vehicle; and (4) there was broken glass from a busted window in the back of the car. While each of these items may be innocently explained, the court must consider the "totality of the circumstances, taking into account an officer's reasonable inferences based on training, experience, and common sense." *Rice*, 483 F.3d at 1083. These facts, taken together, indicate the officers had a basis to believe the passenger posed a threat to themselves and that criminal activity was afoot, further supporting the legality of their efforts to identify the passenger and have him exit the vehicle.

Nevertheless, Espinosa argues that the stop in this case was unlawful because it "1) lasted longer than was necessary to effectuate the purpose of the stop, and 2) the scope of the detention was not related to its underlying justification." (Defendant's Motion 9, ECF 24.) He claims that

---

[4] Mr. Espinosa argues that Detective Dunbar merely had a "hunch," not actual knowledge, that Juan Rendon was not the passenger's name. This is contrary to Detective Dunbar's uncontroverted testimony that he "knew" the name was false. (Tr. 15: 24.) Further, unlike when detention exceeds the scope of the traffic stop, where the distinction between a hunch and actual knowledge is material, here reasonable suspicion is not required and the extent of Detective Dunbar's knowledge is therefore immaterial.

because the stop was for a "minor traffic infraction," it should have lasted no more than a few minutes to check of Ms. Gallegos's license and registration. (*Id.* at 9–10.) He claims the delay between the stop and the checking of Ms. Gallegos's documents with dispatch, approximately 22 minutes, demonstrates that the officers had abandoned the mission of the stop.

It is true that "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed," *Rodriguez*, 135 S.Ct. at 1614, and that "questioning on matters unrelated to th[e] mission is improper if it 'measurably extend[s] the duration of the stop.'" *Cone*, 868 F.3d at 1152 (alteration in original) (quoting *Rodriguez*, 135 S.Ct. at 1615). But as *Rodriguez* makes clear, measures taken to secure officer safety are a part of the mission of the stop and are distinct from investigative activities such as delaying the a stop in anticipation that a drug-sniffing dog would arrive on scene. 135 S.Ct. at 1616. And Mr. Espinosa has pointed the court to no authority for the idea that the officers were required to run Ms. Gallegos's information through dispatch before the passenger's. The officers here were taking steps to execute the stop expeditiously as Mr. Espinosa contends they were required to do, and they deviated from that plan only after the passenger lied in response to questioning and refused direction to exit the car. Both are actions the officers were authorized to engage in for their own safety. Therefore, the officers' steps to secure their own safety, which they had reason to fear was in danger, explains the delay here. Because officer safety is a part of the mission of a traffic stop, the officers' detention of Mr. Espinosa did not violate his Fourth Amendment rights.

## CONCLUSION

Because Mr. Espinosa was detained as a part of a lawful traffic stop at the time the evidence was observed, his Motion to Suppress is DENIED. (ECF No. 15.)

DATED this 26th day of April, 2018.

BY THE COURT:

Clark Waddoups
United States District Judge